UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Jordan Doe ) | CIVIL ACTION NO. |
| ) | |
| v. ) | |
| ) | |
| Boston Public Schools ) | REDACTED VERSION |
| ) | |

COMPLAINT

I. **PRELIMINARY STATEMENT**

1. This action is brought by Jordan Doe ("Jordan") to secure reasonable attorneys fees, costs and expenses arising from this action and an administrative proceeding at the Massachusetts Division of Administrative Law Appeals, Bureau of Special Education Appeals ("BSEA"), at which Jordan succeeded in enforcing his rights pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq., and Chapter 766 of the Acts of 1972, G.L. Ch. 71B ("Chapter 766"). A copy of the Hearing Officer's decision in the underlying BSEA matter (the "BSEA Decision") is attached to this complaint as Exhibit A. The facts set forth below were found by the Hearing Officer in the Hearing Officer's Decision dated July 24, 2013. The Hearing Officer's decision is final because it has not been appealed.

II. **JURISDICTION**

2. This court has jurisdiction over this matter pursuant to 20 U.S.C. § 1415(i)(3)(A).

III. **PARTIES**

3. Plaintiff, Jordan Doe, is a seven-year old resident of Boston with identified disabilities who lives with his parents ("Parents"), and siblings.

4. Defendant, Boston Public Schools ("Boston"), is established under the laws of the Commonwealth of Massachusetts and is a public corporation with the capacity to be sued. Defendant receives federal funds from the United Stated Department of Education pursuant to the Individuals with Disabilities Education Act, 20, U.S.C. §1400 et seq., and is required to provide a free and appropriate public education ("FAPE") to all children with disabilities who reside in the school district.

## IV.   FACTUAL ALLEGATIONS

5. Jordan is a seven year old child who lives with his Parents and siblings in Boston. Jordan received a diagnosis of PDD-NOS when he was about 15 months old. (BSEA Decision Findings of Fact Paragraphs 1 and 4)

6. Starting at age 18 months, Jordan received Early Intervention services. Since the age of three, Jordan has received special education services from Boston and has attended a program for children on the autism spectrum at the Joseph Lee Academy Pilot School ("Lee Academy"). Jordan's eligibility for special education and related services is not disputed by Boston. Jordan is a smart, playful, happy, friendly, very likeable child. He is enthusiastic, eager to learn, and very responsive to his environment and to other people. (BSEA Decision Findings of Fact Paragraphs 1 and 4)

7. According to testing conducted in December 2012, Jordan's cognitive performance is uneven, with average-range basic language, nonverbal, and spatial reasoning skills and much weaker higher-order language reasoning, social pragmatic, and executive functioning skills. Academically, as of December 2012, Jordan had generally average-range skills in basic reading, spelling, and math calculation, but his skills were weaker in reading comprehension and math problem solving. (BSEA Decision Findings of Fact Paragraph 2)

8. Consistent with his diagnosis of autism, Jordan has difficulty with communication, attention, and social interaction. He has some stereotyped behaviors (e.g., talking to himself and "hand puppets"). He tends to be self-directed and is usually not able to engage in age-appropriate reciprocal play with other children. (BSEA Decision Findings of Fact Paragraph 3)

9. Boston conducted its initial evaluation of Jordan in September and October 2008, shortly before Jordan's third birthday. Boston's evaluation consisted of psychological, speech/language, educational, occupational therapy, and ABA assessments. (BSEA Decision Findings of Fact Paragraph 5)

10. Boston's evaluation revealed that Jordan had significantly reduced communication skills, clustering at the 15 month level (at Jordan's age of about 33 months). He could follow some rote directions and identify some familiar objects. He communicated primarily with gestures, a few signs, and a small amount of spoken language. At home, Jordan was impulsive and sometimes tried to break away from his Parents and run to the street. He sometimes imitated other children but did not play with them. He had tantrums at home and in the community when he was frustrated. Overall, Jordan had strengths in his motor skills, imitation skills, and ability to play with toys appropriately, and weaknesses in his social interactions, ability to comply with teacher requests, and communication skills. (BSEA Decision Findings of Fact Paragraph 6)

11. In January 2009, Boston issued an initial individualized education program ("IEP") for Jordan covering the period January 2009-November 2009, which contained goals in the following skill areas: social/emotional, language, self-help, academic readiness, and motor. The IEP provided for placement in a substantially separate early childhood classroom at Lee Academy, together with pullout services in speech/language and occupational therapy and 60 minutes/day, 4 days per week of individual applied behavior analysis ("ABA") services. Parents fully accepted this IEP and placement. (BSEA Decision Findings of Fact Paragraph 7)

12. In November 2009, Boston issued a successor IEP providing for continued placement in the autism program at Lee Academy with updated goals and objectives. (BSEA Decision Findings of Fact Paragraph 8)

13. In January 2010, Parents partially rejected this IEP because they felt it provided insufficient amounts of ABA, speech, and occupational therapy ("OT") services. Despite Jordan's progress in some areas, Parents felt that Jordan had not made sufficient progress in language, behavior, or social skills, and was not generalizing skills to the home or community. (BSEA Decision Findings of Fact Paragraph 8)

14.     In March 2010, Jordan was evaluated by Leslie Deutchman, MS, BCBA, the Executive Director of Apex Behavioral Consultation and a BCBA with approximately 30 years of experience both in providing direct ABA services and in supervising ABA therapists. (BSEA Decision Findings of Fact Paragraph 9)

15.     After observing Jordan at home and in his classroom, Ms. Deutchman concluded that "[i]ntensive ABA services are vital to allow [Jordan] to develop the critical skills to make academic gains and establish social competency. At 4.3 years old, he is almost past the usual age when such behaviors are addressed and nearly past the crucial developmental state when language and behavior competence are most readily mastered. His deficits are a profound obstacle to future independence and school and community success." (BSEA Decision Findings of Fact Paragraph 10)

16.     Ms. Deutchman reported the following areas of concern, particularly in the home setting: lack of language skills, lack of social skills, lack of grooming skills, lack of dressing skills, lack of appropriate eating skills, lack of interactive play skills, lack of age appropriate independence, lack of executive functioning skills, echoic language, scripted language, lack of pre-academic skills, lack of peer interaction, lack of age-appropriate attending skills, lack of age-appropriate toileting skills, lack of safety skills, safety awareness, food issues, bolting, lack of eye contact, maladaptive behavior, screaming, and mouthing. (BSEA Decision Findings of Fact Paragraph 11)

17.     Ms. Deutchman recommended a home-based ABA program consisting of at least fifteen (15) hours per week of both discrete trial training (DTT) and natural environment training to address language and social development as well as 1.5 hours per week of family consultation. She stated that the ABA home program should be highly specialized, systematic, and comprehensive, with systematic instruction in all deficit and at-risk areas, using "scientifically validated behavior analytic procedures and programming based on the principles of [ABA]" and that service providers should be supervised by a highly-experienced BCBA. (BSEA Decision Findings of Fact Paragraph 12)

18.     Ms. Deutchman concluded that Jordan had "much unmet potential," evidenced by his being "very likeable and charismatic," with "the social relatedness and interest

4

in his environment that will allow him to maximize interventions." She further concluded that Jordan would "learn critical skills and thrive when intensive, high-quality home services are provided." On the other hand, Ms. Deutchman opined that "[p]rogramming that is inadequate both quantitatively and qualitatively will guarantee continued failure," and put Jordan "at great risk for escalating behavior problems and dramatic limitations on his academic performance, social development, and ability to be independent as an adult." (BSEA Decision Findings of Fact Paragraph 13)

19. In June 2010, the Parents rejected the November 2009-November 2010 IEP in full. At some time during the 2010-2011 school year, Parents and Boston negotiated an agreement under which Jordan's individual ABA services would be increased from 4 to 15 hours per week, divided between home (5 hours per week) and school (10 hours per week). Under the terms of this agreement, the provider for Jordan's ABA services was the program operated by Ms. Deutchman, Apex Behavioral Consulting ("Apex"), which negotiated a contract with Boston for this purpose. Apex is not the ABA provider associated with the Lee Academy autism program. Such services were provided and/overseen through the May Institute. (BSEA Decision Findings of Fact Paragraph 14)

20. From the end of the 2010-2011 school year forward until the BSEA decision, Jordan has received 15 hours of weekly ABA services. (BSEA Decision Findings of Fact Paragraph 15)

21. Boston conducted an annual review in approximately May 2011, when Jordan was approximately 5 ½ years old. At that time he was continuing in his placement in a substantially separate Early Childhood classroom for children with autism at the Lee Academy. His class consisted of seven children, aged 3 to 5 years old, and three adults. The classroom was structured, with a visual support system in place. In addition to classroom instruction, Jordan was receiving small group speech/language therapy 3x30 minutes/week and occupational therapy 2x30 minutes per week. (BSEA Decision Findings of Fact Paragraph 16)

22. Although the educational assessment dated May 5, 2011 indicated some improvements in Jordan's academic abilities, which Parents attributed to the ABA services he was receiving rather than his school placement. he continued to have weaknesses in behavior and

social skills, engaged in "scripting" during the day (repeating phrases and comments he had heard), as well as echolalia, and engaged in parallel play with other children rather than interacting with them. Additionally, Parents were concerned that Jordan was engaging in more screaming, yelling, and oppositional behavior at home. (BSEA Decision Findings of Fact Paragraph 17, 21, and 23)

23. In May 2011, Boston issued a proposed IEP for May 2011 to January 2012. This IEP provided for continued placement of Jordan at the Lee Academy, with services in academics, speech therapy (3x30 minutes/week), OT (2x30 minutes/week), and 5x2 hours/week of ABA services. Parents rejected this IEP. (BSEA Decision Findings of Fact Paragraph 23)

24. In June 2011, Parents obtained a neuropsychological evaluation from Ellen O'Donnell, Ph.D. at the LEAP program of Massachusetts General Hospital. Dr. O'Donnell's evaluation consisted of standardized testing and behavioral observations as well as an interview with Parents. (BSEA Decision Findings of Fact Paragraph 24)

25. Jordan's cognitive performance, as measured by the Differential Ability Scales (DAS) fell in the "average" range for nonverbal reasoning and the "low" range in his language skills. Achievement scores on the WIAT were "average" for early reading skills and "below average" for math problem solving. Jordan's language skills ranged from "average" for an expressive vocabulary test to "borderline" or "low" for language measures requiring comprehension and attention to detail. Testing also indicated that Jordan struggled with memory, attention, and executive functioning. Parent and teacher surveys of Jordan's adaptive functioning indicated that he had much weaker skills in the communication, social, play, leisure, independence, health/safety, and self-care domains than he did in academics. (BSEA Decision Findings of Fact Paragraph 24)

26. Dr. O'Donnell concluded that Jordan met the criteria for autism based on qualitative impairments in social interaction and communication, a pervasive pattern of restricted and stereotyped behaviors, and impaired self-care and social skills. Nonetheless, Dr. O'Donnell concluded that Jordan had strengths suggesting a good prognosis, including average nonverbal

reasoning ability, functional academics, some ability for shared interest, and gains from increased hours of ABA. (BSEA Decision Findings of Fact Paragraph 25 and 26)

27. Dr. O'Donnell recommended placement in a substantially separate, 12-month ABA infused program for children on the autism spectrum. She further stated that Jordan needed intensive individualized ABA services at home and at school, with a minimum of 12 hours per week of home services; at least 3x45 minutes per week of individualized speech/language therapy focusing on articulation, pragmatic language and social skills; regular meetings of Parents and providers, daily home-school communication, close monitoring by a specialized autism treatment team, and follow-up testing in 1.5 ½ to 2 years. (BSEA Decision Findings of Fact Paragraph 27)

28. Boston convened an IEP Team meeting after receiving Dr. O'Donnell's report. At this meeting, Parents requested increased ABA services in light of Dr. O'Donnell's report, but the School did not grant this request. (BSEA Decision Findings of Fact Paragraph 28)

29. In October 2011, the School issued a proposed IEP for January 2012 - January 2013 that continued Jordan's placement in the Lee Academy, with the same number of ABA hours a previously. Parents partially rejected this IEP in November 2011 because of the absence of a year-round ABA program, an additional 7 hours per week of home-based ABA, additional OT and speech therapy, and a 1:1 aide for all inclusion activities. The Parents requested continued services pending resolution of the disputed IEP. (BSEA Decision Findings of Fact Paragraph 28)

30. Boston then proposed an "unscheduled re-evaluation" (meaning they agreed to conduct Jordan's upcoming 3-year reevaluation a few months earlier than originally planned). This evaluation comprised psychological, educational, occupational therapy, speech/language and ABA assessments. (BSEA Decision Findings of Fact Paragraph 29)

31. The psychological assessment consisted of an observation of Jordan on three different days in December 2011 by Leslie Grogan, Boston school psychologist. (BSEA Decision Findings of Fact Paragraph 30)

32. Ms. Grogan observed Jordan in his classroom and during inclusion activities, and concluded that Jordan was deriving benefit from his classroom setting and interventions, as well as from inclusion opportunities. (BSEA Decision Findings of Fact Paragraph 30)

33. In January 2012, an ABA evaluation progress report was completed by BCBA Andrea Barruch, who supervised Jordan's ABA program, and Leslie Deutchman. Ms. Barruch reported that Jordan had responded "extremely well" to discrete trial training. Jordan's academic and OT skills as addressed in the ABA sessions were also progressing. Ms. Baruch's assessment of Jordan with the VB-MAPP Barrier Assessment revealed continued obstacles to Jordan's language acquisition, including mild to moderate levels of minor negative behaviors (screaming, crying, non-compliance), and stereotypy. The levels of negative behaviors were diminishing to very low levels in the context of school-based ABA. Ms. Barruch recommended continued intensive ABA services. The educational assessment noted that Jordan had strengths in his reasoning and academic skills as well as his creativity and ability to respond to structure and positive reinforcement. Jordan had continued weaknesses in social interaction skills and distractibility. (BSEA Decision Findings of Fact Paragraph 31 and 32)

34. In March 2012, Parent obtained an observation of Jordan in his classroom by Rebecca Tubbs, Psy.D., from the Integrated Center for Child Development. Dr. Tubbs is a pediatric neuropsychologist with experience observing children in classroom settings, including children on the autism spectrum. Dr. Tubbs observed Jordan for a total of about three hours on two different days. In sum, Dr. Tubbs concluded that Jordan's program was not intensive or focused enough to consistently address his high level of distractibility, off-task behavior, and language deficits. She felt that Jordan had a great deal of potential to make progress that was not being developed because so much time was being spent on redirecting and managing Jordan after he was off task. Much of the redirection was being done by the teacher at the same time that she was trying to do group instruction. The classroom aides were relatively uninvolved, or became involved after the fact. (BSEA Decision Findings of Fact Paragraph 33)

35. Dr. Tubbs noted that Jordan's ABA services from Apex took place outside of the classroom, and the program books were kept outside of the classroom. Dr. Tubbs was told

explicitly that there was no carryover of ABA goals or activities into the classroom. (BSEA Decision Findings of Fact Paragraph 34)

36. Dr. Tubbs recommended placement in a more specialized program that "can comprehensively address his language-based deficits across curriculum, while simultaneously managing his behavioral dysregulation and attention vulnerabilities." She stated that the program should be guided by ABA principles throughout the day, and recommended at least 30 hours of individual ABA instruction per week (divided between home and school), most instruction delivered in individual, discrete trial format, and/or 1:1 support for all academics, a highly specific behavioral intervention plan to address dysregulation and atypical behavior, daily, ongoing data collection, and supervision of the entire program by a BCBA. (BSEA Decision Findings of Fact Paragraph 35)

37. The IEP Team reconvened in approximately May 2012 to consider Dr. Tubbs' report, and on May 9, 2012 issued an IEP that continued the configuration of services and placement as the prior IEPs, with adjusted goals and objectives. Parents rejected the sufficiency of ABA services, the absence of 1:1 services, and the particular classroom placement, but requested that the services in the IEP be implemented pending resolution of the dispute. (BSEA Decision Findings of Fact Paragraph 36)

38. Parents filed a hearing request with the BSEA in August 2012. Jordan continued at the Lee Academy program for the 2012 - 2013 school year. (BSEA Decision Findings of Fact Paragraph 38)

39. Dr. O'Donnell evaluated Jordan a second time on November 7, 2012, after the Parents had requested the BSEA hearing, and issued a report on or about December 3, 2012. Based on standardized testing, Dr. O'Donnell concluded that Jordan's intellectual functioning was similar to that measured in prior testing. He had gained some ground in math, but scored relatively lower on early reading skills measures than he had in 2011. (BSEA Decision Findings of Fact Paragraph 39)

40. Dr. O'Donnell recommended the following: a substantially separate, full-day, full year ABA-infused program, with intensive, individualized therapies provided by a

4822-0280-7830.2

trained ABA specialist at school and at home. She recommended that all academics be taught in an individualized special education setting, tutoring provided by an aide qualified in ABA, with most information presented using discrete trials in light of Jordan's learning and memory weaknesses. She recommended instruction focused on helping Jordan apply his existing basic academic skills to reading comprehension and math problem solving. Dr. O'Donnell further recommended increased OT and speech therapy and a social skills curriculum used during all group time and a daily social skills group. (BSEA Decision Findings of Fact Paragraph 40)

41. In April 2013, Dr. Tubbs again observed Jordan at the Lee Academy program. Dr. Tubbs reported that she observed some improvements to the program: the aides were more engaged with the children, there was a BCBA, Brian Blair, who had been serving as a classroom consultant since January 2013, and the class-wide behavior plan was more visually accessible. However, Dr. Tubbs felt that the program was still inappropriate for Jordan for the same reasons that she had cited the prior year: insufficient ABA instruction, lack of pro-active intervention in off-task behavior, lack of carryover between the ABA provider and the classroom, and an overly slow pace of instruction (once engaged, Jordan would complete academic tasks quickly, then drift off task). (BSEA Decision Findings of Fact Paragraph 41)

42. Dr. Tubbs reiterated the same programmatic recommendations she had made in her prior report and commented that Jordan had been attending his current program in Boston for several years, but had made only modest progress in his areas of need. She felt that he had the potential to make more progress with a more intensive ABA-based program. (BSEA Decision Findings of Fact Paragraph 37)

43. Dr. Tubbs was also concerned by what she termed a change in Jordan's presentation. His activity level was lower, but he seemed more anxious, angrier, and was talking to himself and scripting in place of some of the physical activity he had exhibited when he was younger. (BSEA Decision Findings of Fact Paragraph 42)

44. At all relevant times in this matter, Parents have provided numerous supplementary services and activities for Jordan. Specifically, Jordan receives weekly private speech therapy and occupational therapy. He attends a weekly social pragmatics group at Confidence Connection during the school year, and, as described below, attends summer camp

4822-0280-7830.2

and private summertime ABA therapy at Confidence Connection as well. Additionally, Jordan attends swimming, dance, art and piano lessons, all of which he enjoys. (BSEA Decision Findings of Fact Paragraph 43)

45. The Hearing at the Board of Special Education Appeals on the issue of whether the Lee Academy was an appropriate placement for Jordan was held by Hearing Officer Berman on April 11, 25, and 26 and May 7 and 8, 2013. (BSEA Decision p. 1)

46. Hearing Officer Berman issued her 16-page Decision on July 24, 2013. Ms. Berman sided almost exclusively with the Parents and Jordan in this dispute. Among other things, she found (i) that Jordan's current IEP and placement do not provide him with a sufficient amount or intensity of ABA services to effectively address the behavioral and attentional issues that interfere with his academic, social and self-care progress, (ii) that Jordan's autism-related behavioral and social skills deficits still significantly interfere with his learning, (iii) that Boston's program was not addressing Jordan's behavioral needs with the consistency and intensity that he requires, and (iv) that Jordan needs many more hours of ABA service than he had been receiving.. Thus, she found that the IEP developed by Boston was not reasonably calculated to provide FAPE to Jordan. (BSEA Decision Findings and Conclusions p. 15)

47. Having concluded that as a result of Boston's failures it had deprived Jordan of a FAPE, as required by law, the Hearing Officer fashioned an order to remedy the violations. Boston was ordered to (i) immediately amend Jordan's IEP to increase the number of hours of individual ABA services to at least 30 (thirty) hours per five-day cycle, and (ii) adjust Jordan's program to ensure close coordination between the ABA providers and classroom teachers, facilitation of social interactions, appropriate data collection and analysis, and supervision by appropriately credentialed personnel. (BSEA Decision Order p. 16)

## COUNT I

### AWARD OF REASONABLE ATTORNEYS' FEES, COSTS AND EXPENSES

48. Plaintiff re-alleges paragraphs 1 through 47 above and incorporates the same as if fully set forth herein.

4822-0280-7830.2

49. The proceeding before the Massachusetts Division of Administrative Law Appeals, Bureau of Special Education Appeals was brought pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. ("IDEA"), and Mass. Gen. L. Ch. 71B. The IDEA provides that:

> *"In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the 'prevailing party.'"* 20 U.S.C. §1415 (i)(3)(B) et seq.

50. Jordan succeeded in enforcing his rights under the IDEA by obtaining a decision from the Bureau of Special Education Appeals that Boston failed to provide him a FAPE as required by law. Jordan is therefore the prevailing party within the meaning of the IDEA, and, as such, is entitled to an award of reasonable attorneys' fees, costs and expenses under 20 U.S.C. §1415(i)(3)(B) et seq.

51. The Attorneys' fees, costs and expenses incurred in enforcing Jordan's rights under the IDEA were reasonable and are based upon the rate prevailing in the community in which the action arose for the kind and quality of the services furnished. 20 U.S.C. §1415(i)(3)(C).

52. By the acts alleged above, Jordan, as the prevailing party, is entitled to an award of attorneys' fees, costs and expenses.

**WHEREFORE**, Plaintiff prays that this Honorable Court provide the following relief:

1. Take jurisdiction of this matter;

2. Award Plaintiff reasonable attorneys' fees, costs and expenses pursuant to the IDEA for the prosecution of the administrative proceeding below;

3. Award Plaintiff reasonable attorneys' fees, costs and expenses pursuant to the IDEA for the prosecution of this action; and

4. Award such other relief as it deems just and proper.

4822-0280-7830.2

Respectfully Submitted,

Jordan Doe

By their attorneys,

*/s/ Thomas I. Elkind*
Thomas I. Elkind
BBO # 153080
James A. Manzi, Jr.
BBO # 318600
FOLEY & LARDNER, LLP
111 Huntington Avenue
Boston, Massachusetts 02199
(617) 342-4000

Dated: *December 13, 2013*